IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES NORRIS, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:23-cv-3148-MAB** |
| ) | |
| U.S. STEEL CORP., ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on Defendant U.S. Steel Corporation's Motion for Summary Judgment (Doc. 40; *see also* Docs. 41, 42). For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part (Doc. 40).

### PROCEDURAL BACKGROUND

Plaintiff James Norris filed this action in September 2023 seeking legal and equitable relief against Defendant U.S. Steel Corporation for alleged violations of his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as well as corresponding state law violations under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-102, *et seq.*, and 775 ILCS 5/6-101, *et seq.* (*see* Doc. 1). More specifically, the Complaint alleges that Defendant discriminated against Plaintiff in his place of employment due to his dyslexia diagnosis (*Id.*). The Complaint then raises an ADA and IHRA claim for each of the following: disparate treatment (Counts I and IV), retaliation (Counts II and V), and failure to accommodate (Counts III and VI) (*see Id.*).

Defendant filed an Answer on November 20, 2023, which generally denied the claims raised in Plaintiff's Complaint (Doc. 7). A Scheduling Order was entered approximately two months later and the parties commenced with discovery (*see* Doc. 20). Discovery delays ensued and the deadline for Defendant to file a dispositive motion was ultimately extended to April 25, 2025 (Doc. 39). Defendant filed the instant Motion for Summary Judgment on that date (Doc. 40). Defendant's Motion was supported by Defendant's Statement of Uncontroverted Material Facts (Doc. 41), numerous exhibits (Docs. 41-1 through 41-13), and a Memorandum in Support (Doc. 42). After receiving an extension (Doc. 46), Plaintiff filed a Response in Opposition on June 16, 2025 (Doc. 47). In support of his Response, Plaintiff included a Response to Defendant's Statement of Uncontroverted Material Facts and a Statement of Additional Material Facts (Doc. 47-1), and several supporting exhibits (Docs. 47-2 through 47-8). Finally, on July 14, 2025, Defendant filed a Reply in Support of its Motion for Summary Judgment (Doc. 51) and a Response to Plaintiff's Statement of Additional Material Facts (Doc. 52).

### FACTUAL BACKGROUND

The parties each submitted a statement of facts (*see* Docs. 41 and 47-1) and responded to the opposing party's statement of facts (Docs. 47-1 and 52). The facts asserted by each party are deemed admitted to the extent that they are admitted and/or supported by materials in the record and not genuinely disputed. *See* FED. R. CIV. P. 56; *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 906 (7th Cir. 2025) ("To survive summary judgment, a party must point to specific facts showing that there is a genuine issue for

trial."). They are also supplemented by other facts the Court came across in its review of the evidence that was pertinent to the issues presented.[1]

     *I.      Defendant's Operations and the Basic Labor Agreement*

Defendant owns and operates Granite City Works, a facility in Granite City, Illinois, that produces steel products (Doc. 47-1 at p. 1).[2] The Hot Strip Mill is a facility within Granite City Works that reheats solid slabs of steel to produce steel coils that meet customer specifications (*Id.* at p. 2). Processes in the Hot Strip Mill are driven by computer programming that is correlated to customer specifications (*Id.*). The steel slabs and coils are tracked through the process by using five or six digit tracking numbers (*Id.*). Equipment at the Hot Strip Mill is set up specifically for the product being produced during a given shift (*Id.* at p. 3). If slabs are produced out of order, this could result in damage, delays, or potential safety concerns (*Id.*). Furthermore, failure to make a product as specified could put the customer at risk, expose Defendant to liability, and jeopardize customer relations (*Id.*). Thus, inaccurately numbering a coil could have catastrophic impacts (*Id.*). Employee bonuses at the Hot Strip Mill are negatively impacted by production delays (*Id.*).

Defendant is a union company, and its workforce is subject to the provisions of a Basic Labor Agreement (*Id.* at p. 4). Under the Basic Labor Agreement, employment positions are assigned "Labor Grades" ranging from LG 1 to LG 5, with LG 1 being the

---

[1] Disputed material facts, as well as the evidence underlying those disputed facts, will be explained and analyzed in the Discussion section of this Order as appropriate.

[2] Because each party's response to the other party's statements of facts includes the original, underlying statements of facts and their supporting evidentiary citations, the Court cites to the Response filings for purposes of judicial economy (Docs. 47-1 and 52).

lowest grade and LG 5 being the highest grade (*Id.*). Each successively higher grade requires greater skill and includes an hourly pay increase (*Id.*). Defendant requires its employees to master all functions of their respective labor grade to be qualified for that position (*Id.* at p. 5). Employees are expected to train, or "break in," on functions in the next labor grade in the line of progression for their position (*Id.*).

The Basic Labor Agreement controls the bidding process for employment opportunities at Granite City Works (*Id.*). The only jobs that are "available" are those posted for bid, which requires an employee to bid on that position (*Id.*). To be awarded an available position on which an employee has bid, among other qualifications, the employee would need to have seniority over other qualified bidders (*Id.*). Moreover, the Basic Labor Agreement does not provide Defendant with the authority to remove or replace an employee with more seniority out of his or her incumbent position (*Id.* at p. 6).

In the Hot Strip Mill, the LG 1 position is referred to as a Utility Person, and an employee holding that position is required to perform multiple functions including Laborer, Depiler, Spellman Relief, and Bander (*Id.*). The Laborer function involves tasks such as sweeping, taking out trash, and running errands (*Id.*). The Depiler function involves the performance of tasks such as pushing stacks of steel slabs onto a conveyor and reviewing slabs to confirm the tracking number found on the slab matches the number on associated paperwork (*Id.* at pp. 6-7). The Spellman Relief function involves confirming a roll's diameter, recording that number into the computer system, and ensuring the correct coil is sent to the speed finisher (*Id.* at p. 7). The Bander function involves putting steel straps around the circumference of the coils (*Id.*).

The LG 2 position in the Hot Strip Mill is referred to as a Utility Technician (*Id.*). Utility Technicians are required to perform functions including Shear, Checker Helper, Spellman, Burner, Craneman, and Charger (*Id.* at p. 8). The Shear function involves following coil numbers throughout the mill, which includes using those numbers to locate a coil, and manually filing out number-intensive reports (*Id.*). The Checker Helper function involves reading a six-digit number from a computer screen several feet away, transcribing that number onto a moving piece of steel with chalk, ensuring the number written on the steel matches the number on associated paperwork, and reading test weight calibration numbers to ensure they fall within an acceptable range (*Id.*). The Spellman function involves confirming the diameter measurement on a roll is correct, recording that number into the computer system, ensuring the correct roll is sent to the speed finisher, and performing all the duties of the Shear and Charger functions (*Id.* at p. 9). The Burner function involves writing serial numbers on all test coupons, putting the coil number on "pickle tests," reading numbers off a micrometer, and taking reclaim numbers from reclaim reports and marking them on reclaim cobbles (*Id.*). The Craneman function involves identifying 24-hour hold coils, hot roll tests, and pickle tests by their coil numbers and taking them off the line (*Id.*). The Charger function involves verifying slab numbers and charging the correct slab in the correct furnace based off those numbers, then ensuring the correct slab number is extracted from the correct furnace (*Id.*). The Charger also tracks the slab numbers in and out of the furnace by following the slab numbers of each slab on the computer tracking system (*Id.*).

II.      *Plaintiff's Initial Employment and Dyslexia Diagnosis*

Plaintiff applied to work for Defendant in 2019 and, at that time, he indicated on a pre-placement medical questionnaire that he did not have any physical or mental limitations that would limit his ability to perform the job (*Id.* at p. 10). Plaintiff was hired by Defendant on January 6, 2020, and since that date, has worked as a LG 1 Utility Person (*Id.*). Plaintiff completed another medical questionnaire in March 2021, wherein he again indicated he did not have any medical concerns that would impact his ability to perform the essential physical or mental duties of his job (*Id.* at pp. 10-11; *see also* Doc. 41-13).

In February 2021, Plaintiff was breaking-in on a LG 2 Utility Technician function as a Checker Helper (Doc. 47-1 at p. 11). Plaintiff completed the breaking-in period as a Checker Helper and was placed on the schedule by Process Coordinator Jordan McBride to work in that function of the LG 2 Utility Technician position (*Id.*). For reasons the parties dispute, Plaintiff contacted McBride on February 13, 2021, and sought to be excused from working as a Checker Helper (*compare* Doc. 41 at p. 8 *with* Doc. 47-1 at p. 11; *see also* Doc. 47-2 at pp. 61-62). In doing so, Plaintiff also disclosed his dyslexia to McBride (Doc. 47-2 at p. 62). Thereafter, McBride sent an email to his colleagues wherein he stated Plaintiff told him he didn't want to work his newly scheduled position because of his dyslexia (Doc. 41-7). McBride then expressed his fear that Plaintiff might claim Defendant discriminated against him, before writing that Plaintiff "voiced his concerns and we rectified the problem by moving him off the job which was his suggestion. He said he did not want to mess up, have me get mad at him, or have any repercussions because of his dyslexia." (*Id.*). McBride then discussed recent issues with mismarked coils

and their increased awareness and conversations with staff as a result (*Id.*). He then wrote, "I am sure the concern of discipline has forced the situation." (*Id.*). Ultimately, because of Plaintiff's conversation with McBride, Plaintiff was removed from the Checker Helper schedule and returned to his previous position as a LG 1 Utility Person (Doc. 47-1 at p. 13).

A few weeks later, Defendant provided Plaintiff with a Request for Medical Information, which was to be taken to his medical provider (*Id.* at p. 14). The Medical Request described the Checker Helper function as requiring a Checker Helper to:

> [R]ead coil numbers from a monitor and write them on coils. Write location on coils. Write customer shorty code on coils. Operate conveyers in both manual and automatic mode. Trouble shoot conveyor issues. Adjust coiler walking beam travel to ensure proper placement. Watch monitors to ensure people are out of conveyor route prior to operating conveyers. Read the test weight calibration weight and make sure it falls in tolerance. Clean up cobbles. Change work rolls at the finishing mill. Housekeeping in the checker shack. Any other assigned task.

(*Id.*; *see also* Doc. 41-3 at p. 3, Doc. 41-9). The Medical Request also specified that "[t]he employee states that he has dyslexia that is impacting his job performance." (*see* Doc. 41-9).[3] The Medical Request then asked the provider to "provide documentation verifying the employees medical condition and recommend any restrictions that may be necessary for him to work in a safety-sensitive industrial setting." (*Id.*).

Plaintiff met with Dr. Margarita Nogin, a licensed clinical psychologist, in May of 2021 (Doc. 47-1 at p. 15; *see also* Doc. 41-10). Thereafter, Dr. Nogin prepared a report that

---

[3] Plaintiff denies having ever made such a statement (*see* Doc. 47-1 at p. 14). However, he does not dispute that this statement is what was included on the Medical Request Form (*Id.*). Given this factual dispute, the Court's recounting of this statement is only being provided to reflect what was written on the Medical Request Form. The Court does not reach any conclusion as to the veracity of the underlying statement.

diagnosed Plaintiff with dyslexia (Doc. 47-1 at p. 15; Doc. 41-10 at p. 3). Dr. Nogin's report also indicated that Plaintiff may wish to discuss appropriate workplace accommodations due to his diagnosis of dyslexia (Doc. 41-10 at p. 3). Dr. Nogin then wrote that "[i]t may benefit [Plaintiff] to record instructions to refer to later, rather than having written instructions or directions. He would also benefit from using audiobooks … [v]oice to text commands … [and] continued extra time on tasks." (*Id.*).

Dr. Nogin prepared another letter regarding Plaintiff's diagnoses and work capabilities on August 4, 2022 (Doc. 47-1 at p. 15; *see also* Doc. 41-11). That letter stated:

> I evaluated [Plaintiff] in April and May 2021. The results of the evaluation yielded diagnoses of dyslexia and ADHD inattentive type. Based on the data from the evaluation and my conversations with [Plaintiff], I do not see any reason that he would be unable to complete necessary tasks for work. Given his diagnosis of dyslexia, I recommended reasonable workplace accommodations, including extra time to read and comprehend written information or having information presented in a verbal format that he can refer to later (recording instructions or information). These accommodations are meant to ease his ability to complete tasks in a timely manner at work and in no way suggest he is unable to do his job successfully. He should not be barred from advancing his career based on this diagnosis as it is not a hindrance to his occupation. He may just require some accommodation to reduce stress and increase efficacy at work. Please let me know if you have any questions or concerns.

(Doc. 41-11; *see also* Doc. 52 at p. 3).

### III.    *Workplace Accommodations and Bids on Other Positions*

A Return to Work with Restrictions Form was prepared for Plaintiff by Defendant's medical department on July 30, 2021 (Doc. 41-12 at p. 1). That form indicated Plaintiff had the restriction to "avoid work involving the precise recording and/or

tracking of numbers/letters." (*Id.*). It then included a note which stated, "medical review at GCW Plant Medical is required prior to any future position changes." (*Id.*).

Thereafter, Defendant allowed Plaintiff to perform the LG 1 position functions of Bander and Laborer, but he was excused from certain functions such as Depiler (Doc. 47-1 at pp. 19-20; *see also* Doc. 41-3 at p. 4). A Return to Work with Restrictions form from February 2022, which was made in response to Plaintiff's bid for a Standard Gauge position, included the same restrictions found in the previous Return to Work form but also marked that "employee will work incumbent job with restrictions." (Doc. 41-12 at p. 2). Plaintiff's bid for that LG 1 position in the Standard Gauge Department was accepted (Doc. 47-1 at p. 21). However, Plaintiff did not accept that lateral position for reasons the parties dispute related to advancement opportunities (*see Id.* at p. 22). In June 2022, Plaintiff was offered an LG 2 Utility Technician Blast Furnace position (*Id.*). However, Plaintiff declined to take that position for personal reasons including uncertainty as to the position's work schedule (*Id.*; *see also* Doc. 41-2 at pp. 44-45).

A Return to Work with Restrictions form was also completed in July 2022 when Plaintiff bid on a position in the Slab Yard (Doc. 41-12 at p. 3). That form noted the same restrictions and found that no work was available for Plaintiff in the slab yard with his restrictions because "any job in the slab yard requires either recording or identifying slab numbers or specific measurements." (*Id.*). Furthermore, after receiving Dr. Nogin's August 2022 letter, Defendant determined that it did not need to modify Plaintiff's workplace restrictions (Doc. 41-8). Defendant did not independently perform any form of functional testing to determine Plaintiff's ability to work any of the jobs he was

excluded from bidding or breaking in on (Doc. 52 at p. 5). Finally, a Return to Work with Restrictions form was also completed in April 2023 when Plaintiff bid on a position in "HSM-UT." (Doc. 41-12 at p. 4). That form again noted Plaintiff's restrictions and found that "employee will not be awarded the U.T. bid with these restrictions." (*Id.*).

## DISCUSSION

### I. Summary Judgment Standard

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(c)). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Substantive law determines which facts are considered material. *See Jaranowski v. Indiana Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023). Moreover, although a non-movant receives the benefit of conflicting evidence and reasonable inferences, he or she is still required to produce sufficient evidence to establish the essential elements of his or her claims. *See Jackson v. Sheriff of Winnebago County, Illinois*, 74 F.4th 496, 500 (7th Cir. 2023).

### II. Analysis of Defendant's Motion for Summary Judgment (Doc. 40)

Defendant argues that it is entitled to summary judgment on each of Plaintiff's disparate treatment, retaliation, and failure to accommodate claims for the reasons

discussed in its Memorandum in Support (*see generally* Doc. 42). The Court addresses each of those arguments in turn.[4]

### a. *Qualified Person with a Disability*

Defendant first argues that it is entitled to summary judgment on Plaintiff's disability discrimination (Counts I and IV) and failure to accommodate claims (Counts III and VI) because Plaintiff has not established that he is a qualified person with a disability. Specifically, Defendant contends that: (1) Plaintiff cannot show that he is a qualified person with a disability because his condition does not substantially limit one or more major life activities (Doc. 42 at pp. 6-7); and (2) Plaintiff's claims fail because he cannot show that he is able to perform the essential functions of the job he desires, with or without reasonable accommodations (*Id.* at pp. 8-9). In response, Plaintiff avers that: (1) reasonable jurors could find that he is a qualified person with a disability under any of the three paths to establish such (Doc. 47 at pp. 4-8); and (2) evidence supports his contention that he could perform the essential functions of the LG 2 Utility Technician Position with or without reasonable accommodation (*Id.* at pp. 8-10).

The Court first considers the question of whether Plaintiff provided sufficient evidence to allow a reasonable jury to find that he is a qualified person with a disability under the ADA and IHRA. As defined by the ADA, "[t]he term "disability" means, with respect to an individual--(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;

---

[4] The Court analyzes Plaintiff's ADA claims concurrently with his IHRA claims "[b]ecause Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework." *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022).

**or** (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1) (emphasis added).

Here, ample evidence demonstrates that Plaintiff suffers from the mental impairment of dyslexia (*see, e.g.*, Doc. 41-10; Doc. 47-2 at pp. 276-277). *See Jett v. Brookhart*, 3:17-CV-517-MAB, 2020 WL 5602822, at *6 (S.D. Ill. Sept. 18, 2020) ("The federal regulations interpreting the ADA indicate that a 'specific learning disability' can constitute a mental impairment, and the regulations explicitly mention dyslexia as an example of a mental impairment.") (citing 28 C.F.R. § 35.108(b)(1)(ii), (b)(2)). Additionally, those same records provide sufficient evidence to create a triable issue of fact as to whether Plaintiff's dyslexia substantially limits him in the major life activities of reading, learning, and communicating (*see, e.g.*, Doc. 41-10) (discussing Plaintiff's disabilities and noting that he previously received special education services related to his reading ability). *See* 42 U.S.C. § 12102(2)(A); *Murphy v. Kamphuis*, 16-CV-1462-PP, 2020 WL 1550136, at *14 (E.D. Wis. Mar. 31, 2020), *aff'd*, 858 Fed. Appx. 939 (7th Cir. 2021) ("The plaintiff has raised a genuine issue as to the material fact of whether he has a disability. The record contains sufficient evidence to allow a reasonable factfinder to conclude that the plaintiff has a disability that substantially limits a major life activity. He says that he has a mental impairment that limits his ability to read, which is a major life activity[.]").

Moreover, even if Plaintiff had not presented sufficient evidence to create a triable issue as to whether he was substantially limited in a major life activity, he undoubtedly presented sufficient evidence to establish that Defendant regarded him as having a substantially limiting impairment. *See* 42 U.S.C. § 12102(1)(C). "An individual meets the

requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." *See* 42 U.S.C. § 12102(3)(A) (emphasis added). "To satisfy [the 'regarded as'] prong of the definition, [the plaintiff] had to offer evidence indicating that [the defendant] believed, rightly or wrongly, that he had an impairment that substantially limited one or more major life activities." *Miller v. Illinois Dept. of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011).

Pertinently, numerous pieces of evidence in the record support the determination that Defendant regarded Plaintiff as having the impairment of dyslexia, which substantially limited his ability to read, learn, and communicate. For example, the Return to Work forms prepared by Defendant's medical department cited the restrictions Defendant imposed upon Plaintiff in recording and tracking numbers and then determined that he could not be awarded certain positions that he bid on due to those limitations (*see* Doc. 41-12 at pp. 3-4). *See, e.g.*, *Johnson v. Am. Chamber of Commerce Publishers, Inc.*, 108 F.3d 818, 819 (7th Cir. 1997) (rejecting the argument that the plaintiff could not have been regarded as having a disabling impairment unless he actually had a disabling impairment, because the question was whether the employer regarded the individual as disabled). Testimony from both David Coombes and Jordan McBride also supports the assertion that Defendant regarded Plaintiff as being substantially limited due to his dyslexia (*see generally* Doc. 47-3; Doc. 47-6). Tellingly, neither Defendant's Motion nor its Reply address this prong of the ADA's disability definition or refute

Plaintiff's contention that Defendant regarded him as having such an impairment (*see* Docs. 42, 51).

Turning to Defendant's second contention—that Plaintiff cannot show he is able to perform the essential functions of the job he desires, with or without reasonable accommodations—the Court finds Plaintiff has provided sufficient evidence to create a triable issue of fact. Admittedly, the Court agrees with Defendant that Plaintiff has provided little to no evidence of reasonable accommodations that could be provided in the context of Defendant's fast-paced, industrial setting. However, Defendant's argument overlooks evidence Plaintiff provided that, when viewed in a light most favorable to Plaintiff, evinces that he was able to perform the essential functions of an LG 2 Utility Technician without any accommodations. In fact, Dr. Nogin's August 2022 letter directly states as much, specifying that "I do not see any reason that [Plaintiff] would be unable to complete necessary tasks for work." (Doc. 41-11). Dr. Nogin's letter also states that her recommended accommodations "in no way suggest [Plaintiff] is unable to do his job successfully. He should not be barred from advancing in his career based on this diagnosis as it is not a hindrance to his occupation." (*Id.*).[5]

---

[5] Understandably, Defendant points to Plaintiff's argument that Dr. Nogin only evaluated him regarding his ability to perform the Checker Helper function to argue that Plaintiff only provided proof of his ability to perform one of the several functions completed by LG 2 Utility Technicians (*see* Doc. 51 at p. 2; Doc. 47 at p. 10) (Specifically, Plaintiff's Response states "Dr. Nogin only evaluated [Plaintiff] with regard to how his dyslexia might impact his ability to perform the Checker Helper Position.").

While this is an argument Defendant can continue to raise in the future, when viewing Dr. Nogin's August 2022 letter in the light most favorable to Plaintiff, the Court does not construe that letter as only providing evidence of Plaintiff's ability to perform the Checker Helper function. Notably, the August 2022 letter provides no indication that Dr. Nogin was only considering Plaintiff's ability to perform the Checker Helper function and it instead talks about his ability to do his job successfully and advance his career (*see* Doc. 41-11). Moreover, even if Dr. Nogin had intended for that letter to only discuss Plaintiff's ability to perform the Checker Helper function, attesting to Plaintiff's ability to perform the Checker Helper function

Furthermore, Plaintiff introduced evidence that he had never been counseled or written up for his job performance (Doc. 52 at p. 2; Doc. 47-2 at pp. 262-268). On the contrary, he testified to having caught numbering mistakes made by other employees on a daily basis (Doc. 47-2 at pp. 262-263). Plaintiff also testified that after Defendant's restrictions were imposed upon him, he successfully worked several jobs that required reading numbers, writing down numbers, or making precise measurements, including Banding, Burning Reclaims, and Spellman Relief (*Id.* at p. 258). Moreover, Defendant does not dispute the fact that Plaintiff successfully completed the breaking-in period for the Checker Helper function without any accommodation (*see* Doc. 47-1 at p. 11).

Thus, when viewed in the light most favorable to Plaintiff, Plaintiff has pointed to sufficient evidence to create a triable issue of fact as to whether: (1) he was a qualified person with a disability; and (2) he was able to perform the essential functions of the job he sought. For all these reasons, Defendant's Motion for Summary Judgment as to Counts I, III, IV, and VI based upon the above arguments is DENIED.

---

(which includes reading a six-digit number from a computer screen several feet away, transcribing that number onto a moving piece of steel with chalk, ensuring the number written on the steel matches the number on associated paperwork, and reading test weight calibration numbers to ensure they fall within an acceptable range) leads to the reasonable inference that Plaintiff was able to perform other LG 2 Utility Technician functions which also involved the tracking of numbers. In any event, the Court notes that other evidence, such as Plaintiff's deposition testimony and the lack of any mistakes made by Plaintiff in the past, would also allow a reasonable jury to infer that he could perform all LG 2 Utility Technician functions (*see, e.g.,* Doc. 47-2 at p. 61) ("I think I can perform them jobs. They're just not giving me an opportunity to prove myself because they put me on their restrictions.").

*b. Reasonableness of Accommodations and Available Positions*

Defendant contends that Plaintiff's Failure to Accommodate claims[6] contained in Counts III and VI fail as a matter of law because: (1) the requested accommodations are unreasonable, ineffective, infeasible and/or create undue hardship; (2) Plaintiff has failed to identify any available, accommodating positions; and (3) Defendant provided Plaintiff with a reasonable accommodation that necessarily defeats his failure to accommodate claims (Doc. 42 at pp. 10-16). In response, Plaintiff avers that Defendant failed to provide any accommodation and instead unreasonably imposed plantwide restrictions upon him even when he was capable of performing all functions without any accommodations (*see* Doc. 47 at pp. 10-13).

As discussed above, Plaintiff has provided evidence to support his claim that he was able to perform all job functions without any accommodation (*see supra* Discussion § II (a); *see also* Doc. 47 at p. 8) ("Norris was able to perform these tasks despite his disability, proving his ability to do so without an accommodation."). Ultimately, while this argument strengthens Plaintiff's other claims, it dooms his failure to accommodate claims raised in Counts III and VI.

Put simply, "[a] disabled employee who is capable of performing the essential functions of a job in spite of her physical or mental limitations is qualified for the job, and the ADA prevents the employer from discriminating against her on the basis of her

---

[6] "In line with the statutory language, the elements of a claim for failure to accommodate an employee's disability are: (1) the employee was a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability." *Conners v. Wilkie*, 984 F.3d 1255, 1260-61 (7th Cir. 2021).

irrelevant disability. But since the employee's limitations do not affect her ability to perform those essential functions, the employer's duty to accommodate is not implicated." *Brumfield v. City of Chicago*, 735 F.3d 619, 633 (7th Cir. 2013) ("In sum, the ADA does not require an employer to accommodate disabilities that have no bearing on an employee's ability to perform the essential functions of her job."). *See also Johnson v. City of Chicago Bd. of Educ.*, 142 F. Supp. 3d 675, 690 (N.D. Ill. 2015) ("Plaintiff's own brief, and the factual record supporting it, show that she cannot prevail on her failure to accommodate claim because she was, in fact, able to perform the essential functions of her job without accommodation."). Here, given Plaintiff's repeated assertions and supporting evidence for his claim that he could perform all job functions without accommodation, the Court finds Defendant cannot be held liable for failing to provide Plaintiff with an accommodation that he did not need.

However, Defendant has argued and pointed to evidence it claims demonstrates that Plaintiff could not perform all LG 2 Utility Technician functions without accommodation (*see* Doc. 42 at pp. 8-9). Thus, to avoid any potential unfairness to Plaintiff in the event the trier of fact finds that he could not perform all LG 2 Utility Technician functions without accommodation, the Court briefly considers whether Plaintiff met his burden by providing sufficient evidence to create a triable issue of fact as to whether a reasonable accommodation existed. *See Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 850 (7th Cir. 2019) ("A plaintiff must first show that the requested accommodation is reasonable on its face. That shifts the burden to the employer to prove that the accommodation would impose on the employer an undue hardship as defined by the

ADA."); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) ("The defendant has the burden to prove that the accommodation would create an undue hardship on the business, but the plaintiff must first 'show that the accommodation [she] seeks is reasonable on its face.'") (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002)).

Dispositively, the Court finds Plaintiff did not meet this burden. Again, Plaintiff has repeatedly claimed that he could have performed the job functions in question without accommodation (*see generally* Doc. 47). Moreover, on the few occasions where Plaintiff discussed Dr. Nogin's recommended accommodations, he admitted that most of those proposed accommodations, such as recorded instructions and voice-to-text commands, would not assist him or be feasible in Defendant's industrial setting (*see* Doc. 47-1 at pp. 16-19). Likewise, Plaintiff failed to provide any explanation as to how the use of audiobooks would aid him or how extra time could feasibly be provided in the context of Defendant's fast-paced, industrial setting. Beyond Dr. Nogin's recommendations, neither Plaintiff's Response nor the record provides an example of a different, reasonable accommodation that Plaintiff sought (*see generally* Doc. 47). Therefore, even if Plaintiff had not contradicted this claim by arguing he did not need an accommodation, he has failed to meet his burden of proof by providing sufficient evidence of a reasonable accommodation that Defendant could have provided.

For the reasons discussed above, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's failure to accommodate claims raised in Counts III and VI.

    *c.*   *The Reasonableness of Defendant's Restrictions*

Defendant next argues that all of Plaintiff's claims must be dismissed because it offered him a reasonable accommodation (i.e., restrictions on his work) and he sought the perceived employment downgrade (Doc. 42 at pp. 16-18). Therefore, according to Defendant, this necessarily implies that it took no adverse action against Plaintiff (*Id.*). In response, Plaintiff maintains that the restrictions Defendant imposed were not reasonable and constituted an adverse employment action because they denied him advancement opportunities (Doc. 47 at pp. 10-13).

When viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff's arguments compelling. First and foremost, Plaintiff has presented sufficient evidence to support his assertion that the restrictions imposed by Defendant were not reasonable accommodations for some or all of the time they were imposed. Again, Defendant imposed plantwide restrictions upon Plaintiff that substantially limited his opportunities for advancement based upon the report of a provider who only considered Plaintiff's ability to perform one function of an LG 2 Utility Technician and never concluded that Plaintiff could not perform that function (*see* Docs. 41-9, 41-10). And even more significantly, Defendant determined that those plantwide restrictions should continue to be enforced even after receiving a letter from the same medical provider that claimed Plaintiff could perform his job successfully with or without accommodation (*see* Doc. 41-11) (noting that Plaintiff's dyslexia diagnosis is not a hindrance to his occupation and accommodations would only reduce stress and increase his efficacy). Thus, when viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the

plantwide restrictions Defendant imposed upon Plaintiff were not a reasonable accommodation.

Moreover, when viewing the evidence in a light most favorable to Plaintiff, the limitations on Plaintiff's career advancement created by Defendant's indefinite, plantwide, restrictions could establish that Plaintiff suffered an adverse employment action. "An adverse employment action is one that significantly alters the terms and conditions of the employee's job[.]" *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). In other words, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1032 (N.D. Ill. 2016) (internal quotation marks and citation omitted). "Additionally, 'the question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral is one of fact ... and so can be resolved on summary judgment only if the question is not fairly contestable.'" *Taylor v. Eli Lilly & Co.*, 1:10-CV-01611-TWP, 2012 WL 4467655, at *10 (S.D. Ind. Sept. 26, 2012) (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).

In this case, Plaintiff has presented evidence which, when viewed in the light most favorable to him, establishes that he was prevented from breaking in on LG 2 Utility Technician functions and ultimately being promoted to an LG 2 Utility Technician because of Defendant's restrictions (*see, e.g.*, Doc. 41-12 at pp. 3-4). *Compare Curtis v. City of Chicago*, 16 C 8042, 2018 WL 1316723, at *3-5 (N.D. Ill. Mar. 14, 2018) (finding that

denying training opportunities that could lead to promotion could constitute an adverse employment action); *with Keen v. Merck Sharp & Dohme Corp.*, 819 Fed. Appx. 423, 426 (7th Cir. 2020) (rejecting an argument that a reassignment left the plaintiff with reduced opportunities for promotion because she presented no evidence of such). Moreover, Plaintiff has presented evidence demonstrating the pay increase for employees holding an LG 2 position (*see* Doc. 41-4). In addition, the evidence indicates that an employee who is breaking in on a higher grade function/position is entitled to receive "the established rate of pay for the job performed." (*see* Doc. 41-4). In other words, Plaintiff has shown that Defendant's restrictions prevented him from receiving a promotion and/or additional pay while breaking in on LG 2 Utility Technician functions.[7]

Defendant also argues that it cannot be said to have taken an adverse employment action against Plaintiff because Plaintiff sought the perceived employment "downgrade." (Doc. 42 at p. 16). *See also Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (finding no materially adverse employment decision existed because, among other reasons, the plaintiff had sought her downgrade). Yet, when viewed favorably to Plaintiff, Defendant's argument fails to address the clear distinction between the limited concern that Plaintiff shared with his supervisor, Jordan McBride (i.e., that he was concerned he may "mess up on numbers" and he wasn't sure if the Checker Helper function was the "best fit" for him (*see* Doc. 47-2 at p. 91)), and the broad action taken by

---

[7] Moreover, Defendant argues that Plaintiff has not presented evidence of an alternative position that he was qualified for that would have been equivalent to the LG 2 Utility Technician position he sought (*see* Doc. 42 at pp. 17-18). However, for the reasons previously discussed, this argument is not persuasive because Plaintiff presented sufficient evidence to create a triable issue of fact as to whether he could perform each function of the LG 2 Utility Technician position. *See supra* Discussion § II (a).

Defendant (i.e., imposing indefinite, plantwide restrictions that prohibited Plaintiff from working or breaking in on any function/position that involved the reading, writing or tracking of numbers). This distinction between the narrow concern Plaintiff expressed to McBride and the broad restrictions Defendant imposed separates Plaintiff's situation from cases such as *Simpson and Hirlston*. *See Simpson*, 196 F.3d at 876; *Hirlston v. Costco Wholesale Corp.*, 2021 WL 3673784 (S.D. Ind. Aug. 19, 2021) (providing a leave of absence to allow the plaintiff additional time to return to work did not constitute an adverse employment action, and neither did demoting the plaintiff when she failed to identify any positions she was qualified to perform). Furthermore, even if Plaintiff had requested to be entirely and permanently excluded from one LG 2 Utility Technician function, this would not necessarily equate to a request to be demoted or denied all advancement opportunities because the evidence shows that Defendant allowed Plaintiff to work as an LG 1 Utility Person even when he was prohibited from performing half of the functions of that position (*see, e.g.*, Doc. 47-1 at pp. 19-20; Doc. 41-3 at p. 4).

Consequently, the Court finds that Defendant is not entitled to summary judgment under this theory. When viewing the evidence in the light most favorable to Plaintiff, Defendant did not provide Plaintiff with a reasonable accommodation and Plaintiff did not seek the broad, plantwide restrictions and advancement limitations he was subjected to.

    d.   *Causation, Comparators and Pretext*

Finally, Defendant argues it is entitled to summary judgment on Plaintiff's discrimination and retaliation claims (Counts I, II, IV, and V) because: (1) Plaintiff failed

to identify comparators who were treated more favorably; (2) Defendant's actions were done for legitimate, nondiscriminatory and nonretaliatory reasons; and (3) Plaintiff failed to show Defendant's justifications were pretextual (Doc. 42 at pp. 18-19). Plaintiff rebuts Defendant's contentions and argues that he provided direct evidence that Defendant imposed restrictions upon him based solely upon his dyslexia diagnosis and/or request for accommodation (Doc. 47 at pp. 13-16).

"To establish disability discrimination, [a plaintiff] must show all three of the following elements: (1) that he is disabled within the meaning of the ADA, (2) that he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) that he suffered from an adverse employment action because of his disability." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001). *See also Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) ("To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action[.]"). Similarly, "[f]or a retaliation claim under the ADA, a plaintiff must submit evidence that (1) she engaged in protected activity, (2) her employer took an adverse action against her, and (3) there was a 'but for causal connection between the two.'" *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022).[8]

---

[8] For the reasons previously discussed, Plaintiff has presented sufficient evidence to create a triable issue of fact as to whether he was disabled under the ADA. *See supra* Discussion § II(a). Likewise, Plaintiff has presented sufficient evidence to create a triable issue of fact as to whether he was qualified to perform the essential functions of an LG 2 Utility Technician without any accommodation. *See supra* Discussion § II(b). Furthermore, the Court has determined that Defendant's restrictions imposed upon Plaintiff could constitute an adverse employment action when the evidence is viewed in the light most favorable to Plaintiff. *See supra* Discussion § II(c). *See also Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115-16 (7th Cir.

Defendant first argues that Plaintiff failed to provide sufficient evidence of comparators who were treated more favorably (*see* Doc. 42 at pp. 18-19). Interestingly, Plaintiff does not spend significant time disputing this contention (*see* Doc. 47 at pp. 15-16). Instead, Plaintiff avers that comparator evidence is only required when attempting to establish discrimination by way of indirect evidence and here, he is relying upon direct evidence of Defendant's allegedly discriminatory and/or retaliatory animus (*see* Doc. 47 at pp. 13-16). *See Sneed v. City of Harvey*, 6 F. Supp. 3d 817, 832 (N.D. Ill. 2013) ("Under the direct method, the plaintiff must offer evidence that his or her disability, or protected ADA activity, caused an adverse employment action."). "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). *See also Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 684 (7th Cir. 2014) (Explaining that circumstantial, direct evidence may include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.").[9]

---

2001) ("This court has held that the denial of a raise may constitute a materially adverse action."). Relatedly, in the context of Plaintiff's retaliation claim, Plaintiff has presented sufficient evidence to allow a trier of fact to determine that he engaged in the protected activity of requesting an accommodation (*see, e.g.*, Doc. 47-1 at pp. 11-12). *See Sanford v. Thor Indus., Inc.*, 286 F. Supp. 3d 938, 948 (N.D. Ind. 2018) ("Requests for accommodation are protected activity under the ADA."). Accordingly, the Court's analysis focuses upon the causation prongs of his retaliation and discrimination claims.

[9] Notably, although the Court has included the above caselaw discussing direct and indirect evidence, the Court wishes to emphasizes that the ultimate question is:

Here, when viewed in the light most favorable to Plaintiff, there is sufficient evidence to establish that but for Plaintiff's dyslexia and/or requested dyslexia accommodation, he would not have been subjected to an adverse employment action. To reiterate, Plaintiff presented evidence that he was never previously counseled for poor job performance or work errors, including during the break in process for the Checker Helper function of an LG 2 Utility Technician (Doc. 52 at p. 2) (admitting that Plaintiff has never been counseled for job performance) (*see also* Doc. 47-6 at p. 70). In fact, Defendant's representative, David Coombes, testified that Plaintiff needed to get medical documentation of his dyslexia and, only after doing so, did Defendant's medical department develop restrictions based on that information (*see* Doc. 47-3 at p. 36).[10] Moreover, after receiving Dr. Nogin's August 2022 letter, Defendant determined that Plaintiff should continue to be restricted because the results of Dr. Nogin's prior evaluation yielded "a diagnosis of dyslexia and ADHD inattentive type, and there's nothing in [the August 2022 letter] that says that that evaluation has changed." (Doc. 47-3 at p. 20). Thus, all of these statements and evidence support the reasonable inference

---

[S]imply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself — or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)

[10] Furthermore, to the extent Defendant contends that it implemented restrictions due to Plaintiff's difficulty in reading and writing numbers, and not due to his underlying dyslexia diagnosis, Coombes' testimony provides sufficient contradictory evidence to present this issue of to the jury (*see generally* Doc. 47-3).

that Defendant's restrictions were imposed upon Plaintiff based upon his disability diagnosis and/or request for accommodation.

In fact, Defendant has consistently argued that its decision to impose plantwide restrictions on Plaintiff was made because of Plaintiff's dyslexia diagnosis and/or his request to be excused from being scheduled as a Checker Helper due to his dyslexia (*see, e.g.*, Doc. 42 at p. 15) ("Here, due to Plaintiff's own concerns about confusing numbers and his doctor's letters noting his Dyslexia and difficulty mixing up numbers, USS restricted Plaintiff from certain job functions in LG 1 and LG 2 which require precision with numbers."). Given this concession, the Court agrees that Plaintiff has provided sufficient evidence to create a triable issue of fact as to whether Defendant imposed restrictions on him based upon his disability (whether real or perceived) and/or his request for accommodation. *See, e.g.*, *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 150 (2d Cir. 2024) ("In the present case, there is direct evidence that the decision by Dr. Merrens to terminate, rather than continue, Dr. Porter's employment was based on her disability.").

The next question, however, is whether Defendant provided an adequate nondiscriminatory and nonretaliatory reason for adversely restricting Plaintiff. *See, e.g.*, *Kersting*, 250 F.3d at 1117 (In the context of a retaliation claim, if the plaintiff "establishes a prima facie case, [the defendant] must then offer a legitimate, nondiscriminatory reason for its adverse action." Thereafter, the plaintiff must rebut the legitimate reason proffered by the defendant.). Here, Defendant argues that it has provided several legitimate, nondiscriminatory and nonretaliatory explanations for its actions including: (1) Dr.

Nogin's report, (2) evidence of the fast-paced and safety-focused nature of Defendant's facilities, and (3) Plaintiff's admission that he requested to be taken off of Checker Helper duties due to his concern about making mistakes tracking numbers (*see* Doc. 42 at p. 19; Doc. 51 at p. 5). Furthermore, Defendant contends that even if the restrictions imposed were considered an adverse employment action, they were made in response to Plaintiff's accommodation request and therefore, were not merely pretext for discrimination or retaliation (Doc. 51 at p. 5) (citing *Serino v. Potter*, 178 Fed. Appx. 552, 556 (7th Cir. 2006)).

Even if the Court were to assume that Defendant relied upon its claimed legitimate, nondiscriminatory and nonretaliatory reasons for imposing restrictions on Plaintiff when he initially requested to be taken off Checker Helper duties, Defendant has not provided corresponding, legitimate reasons for the continued imposition of those restrictions after receiving Dr. Nogin's letter in August 2022 (Doc. 41-11) and learning of Plaintiff's continued desire to work positions that involve numbers (*see, e.g.*, Doc. 41-12 at pp. 3-4). Critically, Dr. Nogin's August 2022 letter provides evidence that Dr. Nogin believed Plaintiff could perform tasks in a timely manner and was able to do his job successfully, with or without accommodation (Doc. 41-11). Moreover, Defendant has claimed that it imposed limitations on Plaintiff based upon its understanding of Dr. Nogin's medical findings (*see, e.g.*, Doc. 47-3 at p. 36). As such, when viewed in the light most favorable to Plaintiff, this new letter alerted Defendant to the fact that it could not rely upon Dr. Nogin's earlier report to justify the continued imposition of plantwide restrictions (*see Id.*).

Yet, rather than conducting testing of Plaintiff's functionality, reaching out to Dr. Nogin for clarification, or providing some other legitimate reason for the continued imposition of restrictions, Defendant instead determined that Dr. Nogin's prior diagnoses remained unchanged and justified the continued imposition of plantwide restrictions (Doc. 47-3 at pp. 20-22) (testimony of David Coombes). In other words, Defendant ignored Dr. Nogin's updated findings and clarifications regarding Plaintiff's ability to "complete necessary tasks for work" (Doc. 41-11) and instead relied solely upon Dr. Nogin's prior disability diagnoses (Doc. 41-10). Tellingly, a reasonable jury could infer that Defendant's blind reliance on Plaintiff's disability diagnoses, particularly after being notified (from the very same provider who made those diagnoses) of Plaintiff's ability to function irrespective of those diagnoses does not constitute a legitimate reason for the continued imposition of indefinite, plantwide restrictions. Put another way, Plaintiff has presented sufficient evidence to rebut Defendant's stated reasons and create a triable issue of fact as to whether those reasons were pretextual.

For similar reasons, Plaintiff has presented evidence that adequately rebuts Defendant's justification based upon the fast paced and safety sensitive nature of their industry. Again, Dr. Nogin's August 2022 letter provides evidence to support the fact that Plaintiff could perform functions involving reading, writing, and tracking numbers without incident (Doc. 41-11). Moreover, the undisputed evidence was that Plaintiff had not been cited for making errors with numbers in the past, including during the time he was breaking in as a Checker Helper (*see* Doc. 52 at p. 2; Doc. 47-6 at p. 70). In addition, Plaintiff presented evidence that other employees mismarked coils on occasion (*see* Doc.

52 at pp. 6-7). Thus, Plaintiff has presented sufficient evidence to rebut this safety concern by demonstrating that Defendant was not actually as concerned for safety as it now claims and Plaintiff posed no greater safety concern than any other employee.

Additionally, the Court finds Plaintiff's vocalized concerns about making numerical errors as a Checker Helper and his request to be taken off Checker Helper duties did not provide Defendant with a legitimate reason for the imposition of indefinite, plantwide restrictions, particularly after receiving Dr. Nogin's August 2022 letter. Pertinently, Plaintiff presented evidence that he only voiced concerns about making errors with numbers in respect to one specific function of an LG 2 Utility Technician (*see* Doc. 47-2 at pp. 90-98; Doc. 41-7).[11] Similarly, Dr. Nogin's initial report only considered Plaintiff's potential disabilities in the context of that function (*see* Doc. 41-9; Doc. 41-3 at p. 3). Accordingly, Defendant has failed to explain how Plaintiff's request to be taken off Checker Helper duties provided a legitimate justification for the indefinite, plantwide restrictions it imposed. Quite simply, when viewing the evidence in the light most favorable to Plaintiff, he never made such a broad request. As such, Plaintiff has presented sufficient evidence to rebut this additional nondiscriminatory and nonretaliatory reason Defendant has offered for its actions. Furthermore, even if Plaintiff's request initially provided Defendant with a legitimate justification for imposing plantwide restrictions, Defendant failed to offer a legitimate, nondiscriminatory and nonretaliatory reason for the continued imposition of plantwide

---

[11] In fact, Plaintiff contends that he requested to be taken off the Checker Helper function primarily because his supervisor, Jordan McBride, had warned him multiple times of the repercussions for making mistakes and he feared losing his job (*see* Doc. 47-2 at pp. 96-97).

restrictions after receiving Dr. Nogin's August 2022 letter (*see, e.g.*, Doc. 47-3 at p. 11) (Coombes testimony that there was a discussion after receiving Dr. Nogin's August 2022 letter, "and the conclusion was that [the restrictions] didn't" need to be modified.).[12]

In conclusion, when viewed in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented sufficient evidence to establish that the adverse employment action he experienced was made because of his dyslexia and/or his request for accommodation of his dyslexia. And significantly, Defendant has not offered legitimate, nondiscriminatory and nonretaliatory explanations for the continued imposition of broad, indefinite plantwide restrictions against Plaintiff. Alternatively, to the extent Defendant offered nondiscriminatory and nonretaliatory justifications for its actions, Plaintiff has presented sufficient evidence to create a triable issue as to whether those reasons were pretextual – particularly after receiving Dr. Nogin's August 2022 letter.[13]

---

[12] Alternatively, by providing both Dr. Nogin's August 2022 letter and other evidence of Plaintiff's ability to work in various LG 1 and one LG 2 functions involving tracking numbers without making errors, Plaintiff has successfully rebutted the nondiscriminatory and nonretaliatory reasons provided by Defendant. This conclusion is further supported by the fact that Defendant has admitted that it took no action whatsoever in response to Dr. Nogin's letter and conducted no functional testing of its own (*see, e.g.*, Doc. 47-3 at pp. 18-22).

[13] Plaintiff has argued that he did not have to rebut Defendant's nonretaliatory and nondiscriminatory justifications because he provided direct evidence of causation (*see* Doc. 47 at p. 15). However, as was previously discussed, "evidence is evidence" and the Court believes the best course of action is to simply consider the evidence presented as a whole, rather than asking whether it is "direct" or "indirect." *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Moreover, Plaintiff's Response brief rebuts Defendant's given reasons and cites to ample evidence to create a triable issue as to whether Defendant's actions were discriminatory/retaliatory and its justifications pretextual. *See Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911 (7th Cir. 2025) ("Accordingly, our statements in *Bless* and *Hitchcock* and other cases to the effect that the plaintiff must 'also show that the explanations are a pretext for the prohibited animus' should not be understood to require additional evidence from a plaintiff, such as some further indication of unlawful animus. Pretext does not require an inference of unlawful animus, but it does permit that inference. This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied.").

For example, Plaintiff argued and cited to evidence that: (1) he made clear to Defendant that he did not want to be restricted in the manner he was and Defendant's actions were not reasonably responding to his accommodation request (*Id.* at p. 14); (2) he could perform jobs and functions involving numbers

Any further dispute as to the merits of this evidence and the legitimacy of Defendant's reasons is more appropriately reserved for a jury. *See Murphy v. Caterpillar Inc.*, 140 F.4th 900, 905 (7th Cir. 2025) ("Caterpillar may ultimately persuade a jury that its reasons for implementing the performance action plan were not discriminatory, but the case calls for trial on that issue rather than summary judgment."). Consequently, the Court finds that Defendant is not entitled to summary judgment under this theory and Counts I, II, VI, and V shall proceed to trial.

<u>CONCLUSION</u>

For the reasons outlined above, Defendant's Motion for Summary Judgment is Granted in part and DENIED in part (Doc. 40). Specifically, Defendant's Motion for Summary Judgment is GRANTED as to the failure to accommodate claims contained in Counts III and VI and those claims are hereby DISMISSED with prejudice. Conversely, it is denied as to Plaintiff's discrimination and retaliation claims raised in Counts I, II, IV, and V, and those claims will proceed to trial. A Status Conference will be set by separate order to discuss trial scheduling and the utility of conducting additional mediation.

**IT IS SO ORDERED.**

**DATED: March 13, 2026**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**

---

without being provided accommodation (*Id.* at p. 8); (3) Defendant's restrictions went well beyond the issue posed to Dr. Nogin (*Id.* at p. 10); and (4) Defendant doubled down on its restrictions even after receiving Dr. Nogin's letter in August 2022 (*Id.* at pp. 12-13). Therefore, while the Court's analysis may have been simplified if Plaintiff had reiterated these arguments when discussing pretext, Plaintiff's failure to do so does not change the fact that he presented sufficient evidence to rebut Defendant's given justifications and support the inference that those reasons were pretextual.